UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| DEAN S. GOOD BUFFALO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  2:14 CV 91 JMB |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves Applications for Disability Insurance Benefits under Title II of the Social

Security Act, and Supplemental Security Income under Title XVI of the Act.  Plaintiff has filed a

Brief in Support of his Complaint, and the Commissioner has filed a Brief in Support of her

Answer.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. §

636(c).

**I.    Procedural History**

On July 19, 2011, Plaintiff Dean S. Good Buffalo filed Applications for Supplemental

Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq., and

Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq.  (Tr. 117-31)[1]

Plaintiff claimed that his disability began on February 15, 2011, as a result of bipolar disorder,

posttraumatic stress disorder ("PTSD"), depression, and anxiety.  On initial consideration, the

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer
(Docket No. 12/filed November 19, 2014).

Social Security Administration denied Plaintiff's claims for benefits. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). On April 9, 2013, a hearing was held before an ALJ. (Tr. 28-61) Plaintiff testified and was represented by counsel. (Id.) Vocational Expert Susan Shea also testified at the hearing. (Tr. 57-60, 74-75) Thereafter, on May 15, 2013, the ALJ issued a decision denying Plaintiff's claims for benefits. (Tr. 6-20) After considering the representative's brief and the treatment records from Mark Twain Behavioral Health Southeast Hospital, dated March 25 through April 5, 2013, the Appeals Council found no basis for changing the ALJ's decision and denied Plaintiff's request for review on August 25, 2014. (Tr. 1-4, 263-69, 545-60) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.     Hearing on April 9, 2013

#### 1.     Plaintiff's Testimony

At the hearing on April 9, 2013, Plaintiff testified in response to questions posed by the ALJ and counsel. (Tr. 30-55) Plaintiff testified that he is married and lives with his wife and two children, ages ten and twelve. (Tr. 33) Plaintiff stands at six feet and weighs three hundred pounds. Plaintiff completed high school. (Tr. 34) Plaintiff testified that he drives when his wife is sick. (Tr. 48)

Plaintiff last worked on February 12, 2011, at Levering Regional Health Center as a certified nurse assistant, but he quit his job because of his substance abuse problems. Before that, Plaintiff worked at the Hannibal schools and Crestview Nursing home as a certified nurse assistant. (Tr. 35) Plaintiff left his jobs by either quitting or resigning due to his substance

abuse problems.  (Tr. 50)  Plaintiff also worked at Wal-Mart, but the job ended due to his mental illness and substance abuse problems.  Plaintiff worked at Regency Mobile Home as a handyman and at ACI Maintenance as a telemarketer.  (Tr. 36)

Plaintiff testified that his mental illness makes it difficult for him to hold down a job. (Tr. 51)  Plaintiff indicated that his mental illness causes conflicts with his supervisors because he has problems with authority.  (Tr. 52)  Plaintiff testified that he also has problems working one-on-one with the nursing home residents and cleaning their bodies.  (Tr. 53)

Plaintiff testified that he consumed alcohol to help him sleep so he does not have the reoccurring nightmares involving accident scenes he allegedly encountered while working as an EMT.  (Tr. 38)  Plaintiff stopped drinking one year prior to the hearing.  (Tr. 38)  Plaintiff testified that he experiences day flashes lasting ten minutes, two to three times a day, four times a week, and these cause him anxiety.  (Tr. 39)  When in public and around people, Plaintiff testified that he experiences heightened anxiety.  (Tr. 40)  Plaintiff testified that his depressed mood makes him not want to talk to anyone, and he wants to be alone.  (Tr. 41)  During a manic episode, Plaintiff testified that he can deal with people; he can go out in public; and he can help around the house by fixing things and caring for the children.   (Tr. 41)  Plaintiff's manic episodes can last one day to a week.  (Tr. 42)  When Plaintiff is depressed, he sits downstairs and experiences mood swings and racing thoughts.  (Tr. 43)   Plaintiff stated that he has difficulty getting along with people.  (Tr. 43)  Plaintiff indicated that he is working with a caseworker to address the anxiety he experiences when he leaves the house.  (Tr. 44)

Plaintiff exercises at the YMCA either in the morning or late at night to avoid crowds. (Tr. 45)  Sometimes Plaintiff has to leave the YMCA because of the number of people present.

Plaintiff testified that he goes to Wal-Mart three to four times a week with his wife. (Tr. 46) Plaintiff attends AA meetings from time to time and goes to treatment with Dr. Goldman every three months, a therapist twice a week, and a community support worker once a week. (Tr. 48) Plaintiff testified he started taking his medication after he stopped drinking. (Tr. 49) Plaintiff testified that he experiences no side effects from his medications. (Tr. 49)

Plaintiff testified that he has not looked for work since February 2011, and he has not discussed looking for work with his therapist. (Tr. 47) When the ALJ noted that the treatment record showed that Plaintiff discussed returning to work and thinking of withdrawing his disability claim, Plaintiff explained that he discussed the possibility of returning to work because his wife had not found a job. (Tr. 48)

### 2. Testimony of Vocational Expert

Vocational Expert Ms. Susan Shea, a rehabilitation counselor, testified at the hearing. (Tr. 55-60, 74-75) The VE characterized Plaintiff's vocational background to include work experience as a security guard, a handyman, a building maintenance worker, a farm hand, and a nurse's assistant. (Tr. 57)

The ALJ asked the VE to assume someone similar to Plaintiff in age, education, and the same past work experience who can "perform simple, routine tasks in a relatively static environment with few changes; no fast production or stringent production quotas. [He works] better with things than people but can have occasional and superficial interaction with co-workers and supervisors but no interaction with the public. And [he is] not required to do any cleaning of bodies or any one-on-one caretaking." (Tr. 57-58) The VE indicated that such individual could not perform any of Plaintiff's past work. (Tr. 58) The VE opined that such

individual could perform other jobs including working as a laundry worker, a machine feeder, a cleaner or a housekeeper.  (Tr. 58)

Next the ALJ changed the limitations in the hypothetical as follows: "for up to 20 percent of a work day the individual cannot make judgments on simple work-related decisions; interact appropriately with supervisors, interact appropriately with co-workers, respond appropriately to usual work situations and to changes in the routine work setting."  (Tr. 59)  The VE indicated that such individual could not perform any of Plaintiff's past work, and such individual would not be able to perform any other work.  The ALJ noted that this hypothetical was taken from the MS assessment doctor.

### B.    Forms Completed by Plaintiff

In the Disability Report - Adult, Plaintiff reported that he stopped working on February 15, 2010, because of his medical conditions.  (Tr. 217-25)  In the Function Report - Adult, Plaintiff reported his daily activities include walking or exercising, using the computer, doing repair work around the house, attending AA meetings and group meetings on a regular basis, and going on some errands.  Plaintiff noted that his wife reminds him to take care of his personal needs, to go places, and to take his medications.  Plaintiff reported becoming argumentative and not liking to socialize.  Plaintiff indicated that he can somewhat follow written instructions, and he does not handle changes in routine well.  (Tr. 241-48)

Plaintiff's wife completed a Function Report Adult - Third Party and reported Plaintiff's daily activities include attending group meetings, attending AA meetings, and using the computer or watching television.  Plaintiff's wife noted that Plaintiff has to be reminded to change his clothes, to bathe, and to take his medications.  Plaintiff's wife noted that Plaintiff

occasionally makes a sandwich, mows, or helps with household repairs.  Plaintiff's wife listed

talking on the phone and being online and sometimes attending church and counseling as his

social activities.  Plaintiff's wife noted that Plaintiff displays antisocial behavior and is

argumentative.  Plaintiff's wife reported that Plaintiff has poor memory and concentration.

Plaintiff's wife indicated that during a manic episode, Plaintiff claps his hands and talks

constantly.  Plaintiff's wife noted that Plaintiff's sleep is disrupted by nightmares, and Plaintiff is

unable to concentrate and follow through with even basic tasks.  (Tr. 226-33)

### III.    Medical Records and Other Records

#### A.    General History

The medical evidence in the record shows that Plaintiff has a history of bipolar disorder,

PTSD, anxiety, and agoraphobia.  (Tr. 270-560)  Although the Court has carefully considered all

of the evidence in the administrative record in determining whether the Commissioner's adverse

decision is supported by substantial evidence, only the medical records relevant to the ALJ's

decision and the issues raised by Plaintiff on this appeal are discussed.

To obtain disability insurance benefits, a claimant must establish that he was disabled

within the meaning of the Social Security Act not later than the date his insured status expired, in

this case September 30, 2011.  Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) ("In order to

receive disability insurance benefits, an applicant must establish that she was disabled before the

expiration of her insured status."); see also 42 U.S.C. §§ 416(I) and 423(c); 20 C.F.R. § 404.131.


#### B.    Mark Twain Behavioral Health - Dr. David Goldman (Tr. 323-32, 471-73, 523-25, 527-28, 546, 559)

Between July 12, 2011, and April 5, 2013, Dr. David Goldman, of Mark Twain

Behavioral Health Services, provided Plaintiff psychiatric treatment.

On July 12, 2011, Dr. Goldman evaluated Plaintiff and formulated a treatment plan for Plainitff's bipolar disorder and alcohol cravings. Dr. Goldman noted that Plaintiff did not exhibit either psychomotor agitation or psychomotor retardation. Plaintiff reported being arrested on numerous occasions and serving "30 day stints in jail for alcohol, trespass, disorderly conduct, and DWI." (Tr. 330) Plaintiff reported being unemployed and currently applying for disability. Based on a mental examination, Dr. Goldman found Plaintiff to be alert and oriented to person, place, time, and situation. After discussing possible medications as treatment, Dr. Goldman decided to continue Plaintiff on Lamictal with the addition of Deplin. In follow-up treatment on August 5, 2011, Plaintiff reported that the medications were helping, and Dr. Goldman continued Plaintiff's medication regimen. Dr. Goldman noted Plaintiff had a normal mental status examination. On September 27, 2011, Plaintiff reported taking his medications without any side effects and attending AA meetings. Dr. Goldman noted Plaintiff had a normal mental status examination and continued Plaintiff's current medication regimen. On November 17, 2011, Dr. Goldman reported Plaintiff had a normal mental status examination and continued Plaintiff's medication regimen.

On March 15, 2012, Plaintiff reported taking his medications when he was not drinking and relapsing in January. Plaintiff indicated that he would restart his medication regimen when he finished drinking. Plaintiff reported being thirty days sober and taking Lamictal and Topamax. Dr. Goldman reported Plaintiff had a normal mental status examination. On May 24, 2012, Dr. Goldman reported Plaintiff had a normal mental status examination and continued Plaintiff's medication regimen. In follow-up treatment on July 19, 2012, Plaintiff reported that

he had not been attending his AA because of "drama," doing more around the house, and blogging with people on the internet about PTSD. Dr. Goldman found Plaintiff's orientation, behavior, thought process, insight, judgment, and cognition to be normal. Dr. Goldman continued Plaintiff's medication regimen. Dr. Goldman treated Plaintiff on August 30, 2012, and Plaintiff reported Topamax was helping him. Dr. Goldman noted Plaintiff had a normal mental status examination.

In follow-up treatment on January 11, 2013, Plaintiff reported that the medications were not controlling his mood swings. Dr. Goldman noted Plaintiff had a normal mental status examination and prescribed a trial of Abilify.

In treatment on March 8, 2013, Dr. Goldman's notes indicate an absence of aggression. Dr. Goldman continued Plaintiff's medication regimen and increased the dosage of Abilify. Dr. Goldman reported Plaintiff had a normal mental status examination. Dr. Goldman also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" ("MSS"), dated March 8, 2013. In that MSS, Dr. Goldman found Plaintiff to be: (1) extremely limited in his ability to make judgments on simple-work related decisions and complex work-related decisions; (2) markedly limited in his ability to understand and remember complex instructions and carry out complex instructions; and (3) moderately limited in his ability to understand and remember simple instructions and carry out simple instructions. With respect to Plaintiff's ability to interact appropriately with supervisors, co-workers, and the public, Dr. Goldman found Plaintiff to be extremely limited in his ability to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to the usual work situations and to changes in a routine work setting. Dr. Goldman noted that Plaintiff had difficulty

moderating his mood resulting in explosive episodes.

During treatment on April 5, 2013, Dr. Goldman observed Plaintiff's behavior, orientation, affect, thought process, insight, and judgment to be normal and continued Plaintiff's medication regimen.

In a letter dated July 12, 2013, Dr. Goldman provided clarification for the definitions of the checked boxes in his MSS to Plaintiff's counsel. Dr. Goldman opined that Plaintiff's "baseline is disrupted and his abilities to perform tasks and interact with others compromised so as stated in the medical source statement." (Tr. 559)

C.    **Mark Twain Behavioral Health - Ben Failor/Ted Oliver** (Tr. 416-40, 474-97, 529-44, 547-58)

Between July 27, 2012, and April 23, 2013, Ben Failor and Ted Oliver, counselors at Mark Twain Behavioral Health Services, provided Plaintiff individual psychosocial rehabilitation treatment.

On July 27, 2012, Plaintiff discussed with Ben Failor strategies to improve his coping skills and anger management. On August 3, 2012, Plaintiff reported a new stressor, his son being hospitalized and diagnosed with type 1 diabetes. Mr. Failor discussed coping skills to avoid drinking.

In therapy sessions on August 8, 16, and 23, 2012, Plaintiff reported about his son's diagnosis of juvenile diabetes, and how as a result, Plaintiff has taken a more active role in meal preparation, house cleaning, and administration of medications. During therapy on September 10, 2012, Mr. Oliver encouraged Plaintiff to continue his abstinence from alcohol.

During home visits on August 10 and 17, 2012, Mr. Failor encouraged Plaintiff to attend AA meetings to prevent relapsing. Plaintiff reported "staying busy by doing puzzles and other

hobbies like playing video games with his son and socializing with his family member." (Tr. 432) Plaintiff noted that he has been able to cope with depressive symptoms and anger better and having participated in his children's activities such as his daughter's swim meets. On September 14, 2012, Plaintiff failed to keep his appointment with Mr. Failor.

In the quarterly review of the individual therapy outcomes and objectives, dated October 1, 2012, Mr. Failor noted that Plaintiff would continue to learn to manage the symptoms of his mental illness by taking his medications as prescribed, attending appointments as scheduled, and developing appropriate coping skills. Mr. Failor noted that, during the appointment on August 30, 2012, Dr. Goldman noticed Plaintiff had not been compliant with his Lamictal medication inasmuch as Plaintiff had not had the prescription refilled since March 12, 2012. Mr. Failor noted that Plaintiff continued to meet with Ted Oliver every other week for individual psychosocial rehabilitation to deal with PTSD symptoms.

On October 12, 2012, Mr. Failor encouraged Plaintiff to go back to work and noted Plaintiff to be negative about his inability to get a job. Plaintiff reported that he wanted "to stop his disability case so that he can go find a job." (Tr. 421) During home visits on October 16, 23, and 30, 2012, Mr. Failor noted that Plaintiff had gone out two to three times over the weekend to the store and was spending time with his children. Mr. Failor praised Plaintiff for following through with the plan to get out in the community at least twice, to attend his daughter's swim meet and to run errands with his wife. Plaintiff further reported "full medication compliance with medications and feel[ing] that they are doing well in helping him cope with mood symptoms." (Tr. 496)

During home visits on November 6, 13, and 20, 2012, Plaintiff reported that working out

has helped him "get rid of frustrations and anger," and he was able to vote and go out with his family twice. After being encouraged to find a job, Plaintiff indicated that he had little interest in looking for work because "he does not want to mess around with his disability case." (Tr. 492) In home visits on December 4, 11, and 18, 2012, Plaintiff reported limited ability to get out of the house due to anxiety and staying away from alcohol using friends. Mr. Failor helped Plaintiff develop coping skills to improve his mood.

During home visits on January 15, 22, and 29, 2013, Mr. Failor reviewed the use of coping skills for dealing with depression. Plaintiff reported that his mood and anger had improved since his Abilify dosage was increased, and he experienced fewer panic attacks.

During home visits on February 5, 12, and 19, 2013, Plaintiff reported helping around the house doing household chores and maintenance; participating in the Watch Dog program at his children's school; and attending his daughter's swim meets.

During home visits on March 5 and 12, 2013, Plaintiff reported increased stress stemming from his siblings wanting him to move back to South Dakota to help care for his mother and step father even though his siblings live with his mother.

In the quarterly review of the individual therapy outcomes and objectives, dated March 25, 2013, Mr. Failor noted that Plaintiff had seen Dr. Goldman twice during the last quarter, once for a medication recheck and once for the medical source statement, and Plaintiff would continue to meet with Dr. Goldman every three months for medication checks.

During home visits on March 26 and April 2, 9, and 23, 2013, Plaintiff reported his medication regimen helping him cope with his symptoms. Plaintiff noted that if he is not awarded disability benefits, "he will have to go to work [because] his family cannot get by

without some finances come in." (Tr. 552) Mr. Failor encouraged Plaintiff to exercise more frequently.

**D.      Crossroads Resources Treatment Records** (Tr. 270-72, 274-76)

On October 31, 2008, Plaintiff reported his presenting problems were his marriage, finances, and alcohol abuse. DUI and public intoxication are listed in Plaintiff's legal history. Counselor Teena Kendrick diagnosed Plaintiff with bipolar disorder not otherwise specified, PTSD, and alcohol dependence. Ms. Kendrick recommended outpatient counseling.

**E.      Hannibal Regional Medical Group - Dr. Lyle Clark** (Tr. 333-52)

Between November 30, 2011, and April 9, 2012, Dr. Lyle Clark at Hannibal Regional Medical Group treated Plaintiff's bipolar disorder and depression.

On November 30, 2011, Plaintiff presented seeking treatment for bipolar disorder and depression. After a mental status examination, Dr. Clark found Plaintiff to be alert and oriented to person, place, time, and situation; his intellect and memory appeared to be fair; and his thoughts demonstrated logical associations; and his insight and judgment were adequate. Dr. Clark listed primary support, occupational, housing, and economic problems his current stressors and included bipolar disorder, panic disorder with agoraphobia, social phobia, PTSD, and alcohol dependence in early/full remission. Dr. Clark prescribed Topamax and increased Plaintiff's Lamictal dosage.

In the medication management visit on December 20, 2011, Plaintiff reported feeling better with the medication without experiencing any side effects, and he was talking more in his groups. Plaintiff's wife also indicated that Plaintiff was doing better. Although advised he should stop smoking, Plaintiff indicated that he would not stop. After a mental status

examination, Dr. Clark found Plaintiff to be alert and oriented; his thoughts demonstrated logical associations; his answers were to the point; and his insight and judgment were adequate.  Dr. Clark continued Plaintiff's medication regimen.  During medication management on January 10, 2012, Plaintiff reported that he continued to do better.  After a mental status examination, Dr. Clark found Plaintiff to be alert and oriented; his thoughts demonstrated logical associations; his answers were to the point; and his insight and judgment were adequate.  Dr. Clark continued Plaintiff's medication regimen.

On March 12, 2012, Plaintiff reported that he is receiving individual counseling at Hannibal Council Alcohol and Drug Treatment and seeing Ted Oliver for counseling.  Plaintiff reported that he had been drinking intermittently.  Dr. Clark continued Plaintiff's medication regimen.  During a recheck on April 9, 2012, Plaintiff reported that his mood was mildly depressed.  Dr. Clark found Plaintiff to be alert and oriented; his thoughts demonstrated logical associations; his answers were to the point; and his insight and judgment were adequate.  Dr. Clark continued Plaintiff's medication regimen.

**F.    Hannibal Regional Hospital** (Tr. 353-415, 441-64, 508-21)

Between April 28, 2011, and February 28, 2013, Plaintiff received treatment several times in the emergency room at Hannibal Regional Hospital.

On April 28, 2011, Plaintiff was admitted for treatment of his chest pain.  Examination showed Plaintiff to be alert and oriented "x3."

On June 11, 2011, Plaintiff presented in the emergency room and reported alcohol intoxication and making statements of self-harm.  Testing showed Plaintiff was intoxicated with a blood-alcohol level of .336.  Plaintiff reported being a binge drinker and having a drinking

problem.  The police officers noted that they had not heard Plaintiff make suicidal statements nor did they note any psychotic behavior.  The emergency room doctor recommended holding Plaintiff until his alcohol level was less than .100.

On September 27, 2011, Plaintiff presented in the emergency room complaining of acute knee pain which started when the vine he was swinging on broke.  Plaintiff reported that he had not had any feelings of sadness or anxiety.

On February 24, 2012, Plaintiff arrived at the emergency room accompanied by police for being drunk and disorderly.

On December 10, 2012, Plaintiff received treatment after cutting his thumb.  Neurologic examination showed Plaintiff to be alert and oriented to person, place, and time.

On February 28, 2013, Plaintiff presented in the emergency room seeking treatment for a laceration on his finger and denied any depression.  The emergency room doctor noted that Plaintiff was alert and oriented to person, place, and time.  Plaintiff indicated that he had not been feeling sad and/or anxious.

**G.     Hannibal Free Clinic - Dr. Larry Nichols** (279-301, 498-507)

Between December 2, 2010, and April 28, 2011, Dr. Larry Nichols treated Plaintiff's low back pain and provided primary care services, which included some mental health treatment.  On December 2, 2010, Plaintiff received a medication refill of his bipolar medication, Lamictal. Plaintiff returned for treatment of bipolar disorder on April 7, 2011.  On August 1, 2011, Plaintiff reported being an unemployed certified nursing assistant seeking treatment for low back pain.  On April 28, 2011, Plaintiff presented complaining of chest pain, and the emergency room doctor referred Plaintiff to Hannibal Regional Hospital for treatment.

### H. Other Record Evidence

#### 1. *Consultative Examination Report -Dr. Frank Froman* (Tr. 302-06)

At the request of Disability Determinations, Dr. Frank Froman completed a mental status examination on July 18, 2011. Plaintiff reported that he started seeing a therapist in the last month and being active in his church. Plaintiff noted that he can do his own self care with his wife reminding him, and he mows the lawn. A mental examination showed Plaintiff to be oriented times three. Dr. Froman noted that Plaintiff's bipolar medication was somewhat effective. Dr. Froman observed that Plaintiff's bipolar disorder was not actively observed during the examination. Dr. Froman found Plaintiff's PTSD did not appear to be a major limitation in Plaintiff's day-to-day performance. Dr. Froman found Plaintiff to be able to perform one to two step assemblies at a competitive rate; able to relate adequately to co-workers and supervisors; and able to understand oral and simple written instructions. Dr. Froman opined that Plaintiff appeared to be fully able to withstand the stress and pressure of competitive employment.

#### 2. *Psychiatric Review Technique and Mental RFC* (Tr. 308-22)

In the Mental Residual Functional Capacity Assessment of July 28, 2011, Dr. David Hill found Plaintiff not significantly limited in understanding and memory, in his ability to remember work-like procedures, and in his ability to understand and remember very short and simple instructions . Dr. Hill found Plaintiff moderately limited in his ability to understand and remember detailed instructions. In all areas of sustained concentration and persistence, Dr. Hill found Plaintiff to be not significantly limited except in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to work in

coordination with or proximity to others without being distracted by them, he is moderately limited.  In social interaction, Dr. Hill found Plaintiff not significantly limited in all areas except his ability to interact appropriately with the general public, he is moderately limited.  In adaptation, Dr. Hill found Plaintiff not significantly limited in all areas.  In conclusion, Dr. Hill opined that Plaintiff retains sufficient residual mental functional capacity to remember and carry out at least simple repetitive or routine tasks on a sustained basis; to sustain concentration and pace in performing at least simple tasks; to relate adequately to others in a work environment as long as he does not have to deal with the public; and to adapt to routine changes in a work environment.

In the Psychiatric Review Technique, Dr. Hill noted Plaintiff has depressive syndrome with sleep disturbance and difficulty thinking and concentrating, alcohol abuse in remission, PTSD, and low normal to borderline intellectual functioning.  Dr. Hill found  Plaintiff to be moderately limited in maintaining social functioning and concentration, persistence, or pace.

### 3. *Options in Psychology Mental Status Evaluation* (Tr. 273)

On December 3, 2009, Dr. Alan Smith, Ph.D., at Options in Psychology, completed a mental status evaluation.  Dr. Smith noted smelling alcohol on Plaintiff's breath, and Plaintiff admitted having consumed alcohol the night before and blacking out.  Plaintiff reported that he was chronic binge drinking and having nightmares because of his PTSD.  Dr. Smith found Plaintiff to have pronounced social anxiety.

## IV. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2012.  (Tr. 11)  Plaintiff has not engaged in substantial gainful activity

since February 15, 2011, the alleged onset date.  The ALJ found Plaintiff has the severe

impairments of bipolar disorder, anxiety disorder, depressive disorder, PTSD, and a history of

alcohol abuse, but no impairment or combination of impairments listed in, or medically equal to

one listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 11-13)  The ALJ found that

Plaintiff has the residual functional capacity to perform a full range of work at all exertional

levels "except he is limited to simple routine tasks in a relatively static environment with few

changes.  The work cannot be at a fast production pace and cannot have stringent production

quotas.  Because he works better with things than people, [Plaintiff] can only have occasional

and superficial interaction with coworkers and supervisors but no interaction with the public."

(Tr. 13)  The ALJ further noted that the work cannot involve the cleaning of bodies or one-on-

one caretaking.

  Based on the foregoing RFC, and the VE's testimony, the ALJ found Plaintiff is unable

to perform any past relevant work.  (Tr. 18)  Plaintiff has at least a high school education and is

able to communicate in English.  The ALJ found that, considering Plaintiff's age, education,

work experience, and residual functional capacity, there are jobs existing in significant numbers

in the national economy he could perform including a laundry worker, a machine feeder, and a

cleaner.  (Tr. 19)  The ALJ concluded Plaintiff has not been disabled within the meaning of the

Social Security Act at any time from February 15, 2011, the alleged onset date, through the date

of the decision.  (Id.)  The ALJ also opined that, although Plaintiff has a history of substance

abuse, this history was not material to his decision inasmuch as Plaintiff testified that he last

consumed alcohol in April 2012, and this testimony was consistent with Plaintiff's continued

reports of sobriety in the medical record.

## V.      Discussion

To be eligible for DIB and SSI, Plaintiff must prove that he is disabled.  Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs.,

955 F.2d 552, 555 (8th Cir. 1992).  Under the Social Security Act, a disability is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§

423(d)(1)(A); 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability

"only if his physical or mental impairment or impairments are of such severity that he is not only

unable to do his previous work but cannot, considering his age, education and work experience,

engage in any other kind of substantial gainful work which exists in the national economy."  42

U.S.C.

§§ 423(d)(2)(A); 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an

ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether

the individual is engaged in "substantial gainful activity."  If he is, then he is not eligible for

disability benefits.  20 C.F.R. § 404. 1520(b).  If he is not, the ALJ must consider step two which

asks whether the individual has a "severe impairment" that "significantly limits [the claimant's]

physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant

does not have a severe impairment, he is not eligible for disability benefits.  If the claimant has a

severe impairment, the ALJ proceeds to step three in which he must determine whether the

impairment meets or is equal to one determined by the Commissioner to be conclusively

disabling.  If the impairment is specifically listed, or is equal to a listed impairment, the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed, or is not the equivalent of a listed impairment, the ALJ proceeds to step four which asks whether the claimant is capable of doing past relevant work.  If the claimant can still perform past work, he is not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy.  In step five, the ALJ must consider the claimant's "age, education, and past work experience."  Only if a claimant is found incapable of performing other work in the national economy will he be found disabled.  20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole."  Pearsall, 274 F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Id.  The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the claimant's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Plaintiff contends that the ALJ committed reversible error when: (1) the ALJ assessed

Plaintiff's credibility; (2) the ALJ failed to determine that Plaintiff's bipolar disorder did not

satisfy Listings 12.04 (affective disorders) or 12.06 (anxiety-related disorders); (3) the ALJ

failed to give any weight to Dr. Goldman's opinions in the MSS;  and (4) the ALJ failed to

accord proper weight to the testimony of Plaintiff's wife.

**A.      Credibility Determination**

Plaintiff contends that the ALJ's decision is not supported by substantial evidence on the

record as a whole, because the ALJ allegedly failed to properly assess his credibility.

The Eighth Circuit has instructed that, in the course of making an RFC determination, the

ALJ is to consider the credibility of a claimant's subjective complaints in light of the factors set

forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  See also 20 C.F.R. §§

404.1529, 416.929.  Accordingly, the undersigned will begin with a review of the ALJ's

credibility determination.  See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) (it is clearly

established that, before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility).

The factors identified in Polaski include: a claimant's daily activities; the location, duration, frequency, and intensity of his symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of his medication; treatment and measures other than medication he has received; and any other factors concerning his impairment-related limitations.  See Polaski, 739 F.2d at 1322; 20 C.F.R. §§ 404.1529, 416.929.  An ALJ is not, however, required to discuss each Polaski factor and how it relates to a claimant's credibility. See Partee v. Astrue, 638 F.3d 869, 865 (8th Cir. 2011) (stating that "[t]he ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting a [plaintiff's] subjective complaints") (internal quotation and citation omitted); Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the ALJ's decision to include a discussion of how every Polaski factor relates to the [plaintiff's] credibility").  Finally, this Court reviews the ALJ's credibility determination with deference and may not substitute its own judgment for that of the ALJ.  See Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination"); Pearsall, 274 F. 3d at 1218.

In this case, the ALJ concluded that Plaintiff's "allegations concerning the intensity, persistence and limiting effects of [his] symptoms are not consistent with the evidence as a whole, persuasive or credible" and his "[t]he record does not support [Plaintiff's] testimony regarding the severity of his mental health impairments."  (Tr. 14, 15)  In evaluating Plaintiff's

credibility, the ALJ determined that he was not fully credible, in part, because the objective medical record and his daily activities do not support his testimony regarding his symptoms. See Samons, 497 F.3d at 820. The ALJ gave sufficient reasons for his adverse credibility finding and substantial evidence in the record supports the ALJ's reasoning. Although the ALJ did not specifically mention Polaski, his opinion complies with that analytical rubric, and he expressly considered numerous Polaski factors.

The ALJ noted that various forms of treatment have been generally successful in controlling Plaintiff's mental health symptoms. See Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009) ("Impairments that are controllable or amenable to treatment do not support a finding of disability."); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding impairments which are controllable or amenable to treatment do not support a finding of disability). The ALJ considered how the medical records showed Plaintiff's psychiatric symptoms stabilized with the use of medications and without any significant, adverse side effects. Likewise, Plaintiff's mental status examinations were mostly unremarkable except for some situational depression, due to family, and financial problems.[2]

---

[2]The undersigned notes that Plaintiff's increased symptoms coincided with times of high stress caused by situational stressors such as primary support, occupational, housing, and economic problems. Indeed, the treatment notes show that Plaintiff's psychiatric symptoms improved with treatment. Situational depression is not disabling. See Gates v. Astrue, 627 F.3d 1080, 1082 (8th Cir. 2010) (ALJ properly found depression not disabling where it "was situational in nature, related to marital issues, and improved with a regimen of medication and counseling); Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations). Also, during treatment, Plaintiff often denied having any depression or anxiety.

Conditions which can be controlled by treatment are not disabling.  See Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009).  The medical record showed that, during treatment, Dr. Goldman reported normal mental status examinations, and Plaintiff indicated that the medications were helping.  Likewise, the mental examinations completed by Dr. Clark and during emergency care routinely showed normal mental status examinations.  The ALJ also considered the fact that Plaintiff denied having any depression or anxiety during treatment in the emergency room on a number of occasions.  Furthermore, Plaintiff reported no adverse drug reactions on his current medication regimen.

The ALJ also discussed how Plaintiff's hearing testimony was inconsistent with the home support treatment records, which routinely suggested that Plaintiff could, if he desired, return to work.  In Plaintiff's hearing testimony, Plaintiff denied that he had considered looking for a job, but he had to retract his denial when the ALJ confronted him with information from the medical record. The ALJ noted that Plaintiff reported how he considered withdrawing his disability claim so he could get a job.  On October 12, 2012, Mr. Failor encouraged Plaintiff to go back to work and noted Plaintiff to be negative about his inability to get a job.  Plaintiff reported that he wanted "to stop his disability case so that he can go find a job."  (Tr. 421)  When encouraged to find a job during treatment, Plaintiff indicated that he had little interest in looking for work because "he does not want to mess around with his disability case."  (Tr. 492)  During treatment in April 2013, Plaintiff noted that if he is not awarded disability benefits, "he will have to go to work [because] his family cannot get by without some finances come in."  (Tr. 552)  "An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole."  Van Vickle v. Astrue, 539 F.3d 825, 828 (8th Cir. 2008).  See also McCoy v. Astrue,

648 F.3d 605, 614 (8th Cir. 2011) (inconsistencies in record detract from a claimant's credibility).  The record in this case supports the ALJ's decision in this regard.

Next, the ALJ discussed how Plaintiff's activity level further undermines his assertion of total disability.  Indeed, Plaintiff admitted that, among other things, he goes to Wal-Mart three to four times a week, occasionally attends AA meetings, and was active in his church.  There are cases in which a plaintiff's ability to engage in certain personal activities "does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity."  Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000) (finding that "staying around the house" and "watching T.V." do not constitute substantial evidence that the claimant could work); see also Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (a claimant's ability to engage in "personal activities such as cooking, cleaning, and hobbies" does not per se constitute substantial evidence that the claimant could work).  But that is not the case here given both the extent of Plaintiff's activities and the ample independent medical evidence that he was not totally disabled.  The medical record includes numerous treating sources who advised Plaintiff to increase his activity level.

Regarding his mental impairments, Plaintiff received routine and conservative treatment since the onset date, i.e., outpatient medication management.  The medical record showed Plaintiff routinely received normal mental status examinations during his treatment with Dr. Goldman.  These are proper considerations.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (conservative treatment supported the ALJ's adverse credibility determination); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (conservative treatment, including exercises and medication, and lack of surgery supported the ALJ's adverse credibility determination).  Plaintiff's failure to

pursue more aggressive treatment would also be a proper consideration when evaluating his credibility.  See Tate v. Apfel, 167 F.3d 1191, 1197 (8th Cir. 1999).

In reviewing the record in this case, therefore, the Court is satisfied that the ALJ complied with the standards outlined in Polaski and did not err in finding Plaintiff's subjective allegations less than credible.  See, Gregg, 354 F.3d at 713 (reviewing court should give deference to the ALJ's credibility determination).

**B.      Listings 12.04 and 12.06**[3]

Plaintiff was first diagnosed with bipolar disorder in October 2008.  A diagnosis in and of itself does not meet the criteria for listing-level severity.  See 20 C.F.R. § 416.925(d).  See also Lott v. Colvin, 772 F.3d 546, 549 (8th Cir. 2014) ("[M]erely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing.") (internal quotations omitted).  "'An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" Blackburn v. Colvin, 761 F.3d 853, 858 (8th Cir. 2014) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)).  Plaintiff bears the burden of showing that he meets all the criteria of the listing.  Id.

For purposes of the impairments indicated in both § 12.04 and § 12.06, the required level of severity for these disorders is met, indicating the presence of a disability, when the requirements in both sections A and B are satisfied, or when the requirements in section C are satisfied.  See 20 Part 404, Subpt. P, App. 1, §§ 12.04, 12.06.  The criteria for Section B are the same for both Listings - his disorder must result in at least two of the following:

---

[3]Although Plaintiff does not challenge the ALJ's finding that he did not meet the criteria of Listing 12.09, the undersigned notes that the ALJ's finding in this regard is supported by substantial evidence.

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended period.

Id. A "marked" limitation may arise when "several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis."

Id. The ALJ opined that, because Plaintiff's impairments did not meet at least two of the criteria, his impairments did not meet the requirements of Listings 12.04 or 12.06. Plaintiff cursorily contends that his bipolar disorder satisfies these criteria as demonstrated by his inability to function every day due to his fluctuating moods; his inability to attend his daughter's swim meet because of the number of people in attendance; and his inability to reliably perform tasks. After careful consideration, the undersigned finds that the ALJ's decision is supported by substantial evidence in the record as a whole.

First, the ALJ found Plaintiff suffered only a mild restriction of activities of daily living. The ALJ noted that, although Plaintiff reported in his Function Report having problems with personal care when experiencing mood swings, Plaintiff also reported mowing the lawn, helping with household chores, exercising, running errands, doing home repairs, watching television, and using the computer. Further, the ALJ noted Plaintiff reported to the consultative examiner that he can perform self care with reminders from his wife, mow the lawn, and do some chores, and his hobbies included fishing and exercising in his home gym. His wife reported Plaintiff needed reminders for personal care and medications, and Plaintiff occasionally helped with household

repairs and prepared meals.  At the hearing, Plaintiff testified that he goes to Wal-Mart three to four times a week with his wife.  The ALJ's determination that Plaintiff has only mild restrictions in the area of daily living is supported by substantial evidence.

The regulations state that "[a]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."  20 C.F.R. § Pt. 404, Subpt. P, App. 1.  The ALJ is charged with assessing the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.  Id.  There is substantial evidence in the record to support the ALJ's finding that Plaintiff performs his own self-care, helped with household chores, completed home repairs, used the computer, and occasionally prepared simple meals.  Finally, as noted by the ALJ, one state agency medical consultant found that Plaintiff did not meet or medically equal the listings, and another determined that Plaintiff has only mild restrictions in his activities of daily living, and Plaintiff's mental impairments did not preclude competitive employment.

The ALJ next found that Plaintiff is only moderately limited in his social functioning.  Although Plaintiff and his wife both noted in their Function Reports that Plaintiff has problems getting along with others, Plaintiff also reported attending group sessions and AA meetings on a regular basis, spending time with others, being active in his church, and going on some errands and to Wal-Mart three to four times a week.  The ALJ noted Plaintiff lives with his wife and children, spends time with others, attends his daughter's swim meets, and is active in his church.  Dr. Froman found that Plaintiff's ability to relate to others was good.  The ALJ further noted that at his home support meetings, Plaintiff reported in addition to attending his daughter's swim

meets, he would also travel with his children for fun.  The undersigned notes that there is no evidence that any of Plaintiff's past jobs ended due to difficulty getting along with other people.

"Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers."  20 C.F.R. § Pt. 404, Subpt. P, App. 1.  A claimant demonstrates impaired functioning by showing, for example, "a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation."  Id.  The undersigned finds that substantial evidence supports the ALJ's opinion that Plaintiff is only moderately limited in his social functioning.

The ALJ also found that Plaintiff did not have repeated episodes of decompensation for extended periods, and Plaintiff does not challenge this conclusion.  Plaintiff does challenge the ALJ's finding that he is not markedly limited in concentration, persistence or pace.  In order to qualify for a listing, Plaintiff's impairments must result in at least two of the limitations listed, and because the undersigned finds substantial evidence on the record as a whole supports the ALJ's findings as to subparts 1, 2, and 4, it is not necessary to review the ALJ's conclusions as to subpart 3.

Citing the Seventh Circuit case of Scott v. Astrue, 647 F.3d 734 ( 7th Cir. 2011), Plaintiff argues that a single notation in the treatment record that he is doing well must be viewed in the context of mental illness and that people suffering from such illness will have good days and bad days.  In Scott, the court found that the ALJ had "cherry-pick[ed]" the mixed results in the notes of claimant's treating psychiatrist to support a denial of benefits.  Id. at 740.  Plaintiff's reliance on Scott is unavailing because the ALJ in this case did not cherry pick evidence.  Indeed, as discussed above, the objective medical evidence detracts from Plaintiff's description of his

mental limitations.

## C.     Weight Given to Treating Doctor's Opinion in the MSS

Plaintiff also takes issue with the weight given to Dr. Goldman's opinion.  The
undersigned finds that the ALJ adequately considered Dr. Goldman's limitations set forth in the
March 8, 2013, Medical Source Statement of Ability to Do Work-Related Activities (Mental)
("MSS"), and properly gave no weight to his opinions in the written opinion because Dr.
Goldman's findings in the MSS were not consistent with his own treatment records.

"A treating physician's opinion is given controlling weight if it 'is well-supported by
medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in [a claimant's] case record.'"  Tilley v. Astrue, 580 F.3d 675, 679
(8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original)).  Opinions of treating
doctors are not conclusive in determining disability status and must be supported by medically
acceptable clinical or diagnostic data.  Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir.
1995); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when
a medical source presents relevant evidence, such as medical signs, in support of his or her
opinion).  When a treating physician's opinions "are inconsistent or contrary to the medical
evidence as a whole, they are entitled to less weight."  Halverson v. Astrue, 600 F.3d 922, 930
(8th Cir. 2010).   "A treating physician's opinion does not automatically control, since the record
must be evaluated as a whole."  Medhaug, 578 F.3d at 815.  Thus, "'an ALJ may grant less
weight to a treating physician's opinion when that opinion conflicts with other substantial
medical evidence contained within the record.'"  Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir.
2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)).  The ALJ is charged

with the responsibility of resolving conflicts among the medical opinions. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

Additionally, Social Security Ruling 96-2p states in its "Explanation of Terms" that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, at *2 (S.S.A. July 2, 1996). SSR 96-2 clarifies that 20 C.F.R. §§ 404.1527 and 416.927 require the ALJ to provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

The record shows Dr. Goldman treated Plaintiff eleven times from July 12, 2011, through April 5, 2013. On March 8, 2013, Dr. Goldman completed an MSS wherein he found Plaintiff to have extreme limitations in making judgments on simple and complex work-related decisions; interacting with coworkers, supervisors, and the public; and responding appropriately to usual work situations and changes.

First, to the extent Dr. Goldman opined that Plaintiff is disabled and incapable of performing any competitive employment, such an opinion "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," because it invades the province of the Commissioner to make the ultimate determination of disability). The ALJ acknowledged that Dr. Goldman was a treating source, but that his opinions in the MSS were not entitled to any

weight because they were inconsistent with his own treatment notes and the objective medical evidence in the record.  See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.").

Dr. Goldman's opinions are inconsistent with his own clinical treatment notes.  Dr. Goldman treated Plaintiff the day he completed the MSS, but Plaintiff did not report the conditions and symptoms that he claims render him totally disabled.  Indeed the day Dr. Goldman completed the MSS wherein he noted that Plaintiff had difficulty moderating his mood resulting in explosive episodes,  Dr. Goldman also checked a box indicating an absence of aggression in the treatment note.   "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010); see also Clevenger v. S.S.A., 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes).  Because Dr. Goldman's opinions are not supported by his treatment notes, the ALJ properly discounted his opinions.  See Wildman, 596 F.3d at 964 (rejecting challenge to lack of weight given treating physician's opinion where the physician renders inconsistent opinions that undermine the credibility of such opinions); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment).

A review of Dr. Goldman's treatment notes also shows he never imposed any mental limitations or any work restrictions on Plaintiff.  See Fischer v. Barnhart, 56 F. App'x 746, 748

(8th Cir. 2003) ("in discounting [the treating physician's] opinion, the ALJ properly noted that ... [the treating physician] had never recommended any work restrictions for [the claimant]").  Dr. Goldman's treatment notes do not reflect the degree of limitation he included in his March 8, 2013 MSS.  Dr. Goldman's own treatment notes never indicate such mental limitations during treatment.  As noted by the ALJ, Dr. Goldman's treatment notes do not include abnormal mental status findings.  Thus, Dr. Goldman's treatment records do not document ongoing abnormal mental status examination findings lasting twelve months.  The relevant lack of supporting evidence includes the absence of any restrictions placed on Plaintiff by Dr. Goldman during his treatment of Plaintiff.  See Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011).  The undersigned concludes, therefore, that the ALJ did not err in affording no weight to Dr. Goldman's opinions of March 8, 2013.

Further, no other examining physician in any treatment notes stated that Plaintiff was disabled or unable to work or imposed mental limitations on his capacity for work.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards, 809 F.2d at 508 (examining physician's failure to find disability a factor in discrediting subjective complaints). The medical records do not evidence any significant abnormalities or deficits with respect to Plaintiff's mood, affect, judgment, cognitive function, thought processes, concentration, attention, pace, persistence, activities of daily living, focus, orientation, or abilities to cope with stress, and to understand and follow instructions.  Thus, the ALJ did not err in giving no weight to Dr. Goldman's opinions in the MSS.  Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ properly gave treating physician's opinion non-controlling weight when that opinion

was largely based on claimant's subjective complaints and was inconsistent with other medical experts).

The ALJ properly accorded Dr. Goldman's opinions in the MSS no weight inasmuch as his findings were inconsistent with, and unsupported by, the evidence of record.  See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.") (citation and internal quotation omitted).  Although the ALJ gave no weight to Dr. Goldman's opinions in the check-box MSS, the undersigned finds that, as a practical matter, the ALJ accorded some weight to Dr. Goldman's finding that Plaintiff's memory was challenged.  The ALJ noted that he was giving Plaintiff every benefit of the doubt by finding Plaintiff had moderate difficulties sustaining concentration, persistence, and pace, and when formulating the RFC, the ALJ limited Plaintiff's work to simple routine tasks in a relatively static environment with few changes without a fast production pace or stringent production quotas.[4]

## D.     Function Report Adult - Third Party

Although the observations of third-parties may support a Plaintiff's credibility, the testimony provided by Plaintiff's wife in the Function Report Adult - Third Party, generally echoed the statements in Plaintiff's Function Report - Adult and his hearing testimony.  The ALJ may discount corroborating testimony on the same basis used to discredit a claimant's testimony. See Buckner v. Astrue, 646 F.3d 549, 559-60 (8th Cir. 2011) (same evidence that ALJ referred to in discrediting plaintiff's claims also discredited his girlfriend's statements).  To the extent his

---

[4]Thus, to the extent the record supports a finding that Plaintiff had memory issues, the ALJ did in fact incorporate such issues into Plaintiff's RFC.  Substantial evidence supports the ALJ in this regard.

wife's reporting echoed Plaintiff's subjective allegations regarding his limitations, the same evidence to which the ALJ referred in discrediting Plaintiff would apply to his discrediting this third party. In the instant case, the ALJ specifically addressed the third party statements and gave his reasons for discrediting as follows:

> No doubt she is a sincere and well-meaning person. However, she is not a medical, occupational or vocational expert capable of determining whether the claimant is precluded from engaging in any substantial gainful activity by reason of a medically determinable impairment. Her natural bonds of affection and support color her statement. She is not a neutral disinterested witness. She has a substantial financial interest in seeing that her husband obtains benefits. It would be an unusual case where a claimant could not produce supporting statements from friends or relatives. For these reasons, her statements are entitled to little weight. In addition, her statements are discounted for the same reasons as her husband's allegations, they are inconsistent with the evidence as a whole. The objective medical evidence and assessments by medical professional are entitled to much greater weight than the claimant's and his wife's allegations.

(Tr. 18) For these reasons and the reasons discussed above with respect to the ALJ's evaluation of Plaintiff's own subjective complaints, the ALJ's decision to give no significant weight to this report is supported by substantial evidence in the record.

## VI.    Conclusion

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above. An ALJ's decision is not to be disturbed "'so long as the ... decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).

Accordingly, the decision of the ALJ denying Plaintiff's claims for benefits should be affirmed.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**. A

separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this __22nd__ day of September, 2015.

_/s/ John M. Bodenhausen_
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE